IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT S. EBEID | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Acting Commissioner of | : | |
| Social Security | : | NO. 17-2917 |

O P I N I O N

JACOB P. HART                                                                DATE:  June 18, 2019
UNITED STATES MAGISTRATE JUDGE

Robert S. Ebeid brought this action under 42 USC §4-5(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  He has filed a Request for Review to which the Commissioner has responded.  As set forth below, I will deny Ebeid's Request for Review, and grant judgment in favor of the Commissioner.

I.   Factual and Procedural Background

Ebeid was born on February 9, 1985.  Record at 213.  He completed high school and later obtained training as a medical assistant.  Record at 36, 237.  He has worked as a surveillance system monitor, movie theatre cashier, office cleaner, document preparer, and in other jobs, although none for long periods of time.  Record at 264.

On April 24, 2013, Ebeid filed an application for DIB.  Record at 213.  He filed an application for SSI on May 6, 2013.  Record at 215.  In his applications, he alleged disability since May 31, 2010, on the basis of injuries to his lower back, shoulder, and left ankle; testicular disorders; renal cysts; black outs and memory issues.  Record at 236.  Ebeid's applications were denied initially and upon reconsideration.  Record at 99, 112, 125, 141.

Ebeid then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 175. A hearing was held on July 24, 2015. Record at 29. Although Ebeid did not initially make a specific claim of mental illness in his original application, at the time of the hearing, his attorney argued that Ebeid was primarily disabled by schizo-affective disorder. Record at 34.

On October 30, 2015, the ALJ issued a written decision denying benefits. Record at 13. The Appeals Counsel denied Ebeid's request for review on April 13, 2017, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Ebeid then filed this action.

II.     Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

>  (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 CFR §404.1520 (references to other regulations omitted).

III.   <u>The ALJ's Decision and Ebeid's Request for Review</u>

In her decision, the ALJ determined that Ebeid suffered from the severe impairments of degenerative disc disease, status post fusion surgery to his left foot to repair displaced metatarsal joints in his left foot; attention deficit hyperactivity disorder ("ADHD"); schizophrenia; an anxiety disorder; a mood disorder; and a substance addiction disorder. Record at 15. She found, however, that Ebeid did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1. Record at 16.

The ALJ found that Ebeid retained the residual functional capacity ("RFC") to engage in sedentary work with postural limitations, except that he had the ability to lift and/or carry ten pounds frequently, and 20 pounds occasionally. Record at 18.

As to Ebeid's non-exertional capacity, the ALJ wrote:

> He can respond appropriately to supervisor's instructions.  The claimant can have incidental contact with the public but not with tasks that involve direct customer service.  He can work around others, but not on tasks requiring teamwork or working in tandem.  The claimant can make simple decisions and adapt to occasional changes in essential work tasks.  Additionally, the claimant will be off-task 5% of the workday due to the impairments … [.].

Id.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ concluded that Ebeid could return to his prior work as a surveillance system monitor, or document preparer.  Record at 22.  She made an alternative finding at the fifth stage of the sequential evaluation that Ebeid could work as a surveillance system monitor, document preparer, or small products assembler.  Record at 23.  She decided, therefore, that Ebeid was not disabled.  Record at 24.

In his Request for Review, Ebeid has not challenged the part of the ALJ's decision concerning his physical capabilities.  He argues, however, that the ALJ erred in finding that his mental illness did not meet Listing 12.03.  He also argues that the ALJ wrongly (a) failed to give adequate weight to the opinions of his treating psychiatrists; (b) inadequately analyzed the records of his 2013 mental hospitalization; (c) failed to address his testimony concerning his delusions and hallucinations; and (d) failed to adequately consider the impact of his mental impairment on his functional abilities.

IV.    <u>Discussion</u>

A.    <u>Listing 12.03</u>

At the time the ALJ issued her decision, Listing 12.03 was entitled Schizophrenic, Paranoid and Other Psychotic Disorders. 20 CFR Pt. 404, Subpt. P, App. 1 §12.03 (replaced on January 17, 2017). Under that version of the regulation a claimant could meet Listing 12.03 by demonstrating:

> Medically documented persistence, either continual or intermittent, of one or more of the following: 1. Delusions or hallucination; or 2. Catatonic or other grossly disorganized behavior; or 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following: blunt affect, flat affect, inappropriate affect, or emotional withdrawal and isolation.

<u>Id</u>. at § 12.03A (now replaced).

The foregoing had to result in at least two of the following: 1. Marked restrictions of activities of daily living; 2. Marked difficulties in maintaining social functioning; 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration. <u>Id</u>. at § 12.03B (now replaced).

As an alternative to paragraph B, the claimant could show:

> [A] medically documented history of a chronic schizophrenic, paranoid or other psychotic disorder of at least two years duration that has caused more than a minimal limitation of the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, in one of the following: 1. Repeated episodes of decompensation, each of extended duration; 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement.

<u>Id</u>. at § 12.03C (now replaced)

The ALJ did not deny that Ebeid displayed the symptoms set forth in §12.03A. However, she found that Ebeid had only moderate difficulties in social functioning and with concentration, persistence and pace, mild restrictions in his activities of daily living, and "one to two" episodes of decompensation of extended duration. Record at 16-17. The ALJ added: "On April 6, 2015, the claimant reported … that he was recently hospitalized due to a cocaine relapse; however, there is no other reference of hospitalization or cocaine use and the claimant testified only to the use of cannabis." Id. Therefore, he did not meet the paragraph B criteria. The ALJ also found that the "paragraph C" criteria were not satisfied.

Ebeid has made the obviously erroneous argument that meeting the A criteria alone "would be enough to warrant a finding of disability." Plaintiff's Brief at 20. The listing specifies that paragraph B or C must also be met. He also argues that the statement provided by his treating psychiatrist, Manal Sous, MD, indicated the presence of marked restrictions in concentration. Further, he points to evidence of episodes of decompensation in the form of hospitalizations with psychotic symptoms. He claims that the ALJ ignored a January 18, 2013, episode where he came to Hackensack University Medical Hospital emergency room seeking the removal of a metal plate in his foot (which proved to be non-existent) because the plate was transmitting voices and music. Record at 413, 420.

First, as noted above, the ALJ recognized that Ebeid had suffered from one or two episodes of decompensation. Record at 17. However, to have qualified as having had "repeated episodes of decompensation" under Listing 12.03, Ebeid would have needed three episodes within one year, or an average of once every four months, each lasting for at least two weeks. 20 CFR Pt. 404, Subpart P, App. 1 §12.00(C)(4) (replaced as of January 17, 2017). The evidence does not support this.

The only mental hospitalization records in the file are from a nine-day admission to Bergen Regional Medical Center between June 4 and June 13, 2012. Record at 314. At this time, Ebeid sought help because of an anxious mood, but without psychotic symptoms such as auditory or visual hallucinations. Record at 318. Drug use was also involved: "Reportedly patient abused 2 mg of cannabis the day before evaluation and one bag of cocaine day before evaluation." Id. He was diagnosed with a mood disorder, cannabis abuse, and cocaine dependency "with physiological dependence," as well as a personality disorder with antisocial traits. Record at 319.

The records from Ebeid's June, 2012, treatment mention an earlier hospitalization "more than five years ago." Record at 318. That would have placed it in 2007 or earlier, long before Ebeid's claimed disability date in 2010. Thus, it would not have counted for the purposes of §12.03(b)(4).

As for the January 18, 2013, episode, there is no question that Ebeid was deeply delusional on that day.[1] He refused inpatient care, so this was not a hospitalization. Record at 423. Nevertheless, it is possible that the ALJ considered this one of his "one or two" episodes of decompensation, on the assumption that Ebeid was in this condition for some time before and after his trip to the emergency room.

In a treatment note dated April 6, 2015, Dr. Sous wrote that Ebeid was "just discharged from BRMC as he relapsed on cocaine." Record at 454. However, the record does not contain

---

[1] According to the emergency room records: "Patient had foot surgery a few years ago. Three months ago, he started to think about his foot and then he had pain in his foot. He thought that he had a piece of metal in his foot, and at the same time, he started to hear singe[r]s talking to him. Yesterday he heard the voice of a singer, telling him 'Balance.' Since [then] he has been trying to figure out what it meant. Patient reports that he understands that he is 'special,' he is 'a glitch in the system.' He has special powers, he is 'mixed' and has 'five colors.' He knows that he is 'blessed', and the 'music people' put a piece of metal in his foot to limit his abilities. The piece of metal gives him the power to hear the lyrics of a song before the singer says it. He feels that the voices are trying to tell him something about his childhood, but he is not sure what this is." Record at 422.

7

records from this hospitalization. Further, it is not clear that a hospitalization for drug detoxification would count as an episode of decompensation pertaining to the mental illnesses described in §12.03.[2]

Even if all of the above-mentioned mental health treatment was considered, it would still not demonstrate three episodes of at least two weeks in a one-year period. Therefore, it would not rise to the level specified in the regulations for a finding of repeated episodes of decompensation.

Turning to Ebeid's deficiencies in concentration, it is true that Dr. Sous indicated in a Medical Source Statement dated November 19, 2014, that he was "unable to meet competitive standards" in the ability to maintain attention for two-hour segments. Record at 409. She wrote: "Pt. cannot sustain focus or stay in one place." Record at 410.

Nevertheless, the ALJ accurately reported that Ebeid indicated in his disability report that he could follow written and spoken instructions well. Record at 17, 261. She also relied on Ebeid's testimony that he was able to drive frequently, use the computer, and watch multiple hours of television. Record at 17, 37-38, 46, 47-8. Thus, although the ALJ accepted Dr. Sous's opinion to the extent that she found Ebeid moderately limited in concentration, substantial evidence supported her conclusion that his limitation was not marked or extreme. Moreover, Ebeid would not meet the listing unless he showed marked limitation in two areas.

---

[2] The ALJ wrote that this note was the only reference to Ebeid using cocaine. It is not. As noted above, cocaine was a factor in Ebeid's 2012 hospitalization. Further, in an August 8, 2011, treatment note, Dr. Sous wrote that Ebeid had recently relapsed on drugs: "mainly cannabis, he admits use of crack and cocaine sometimes." Record at 460. Thus, there is evidence of cocaine use in 2011, 2012, and 2015. This contradicts Ebeid' testimony at his hearing that he only used marijuana, and stopped in 2006. Record at 39. It also complicates the record as to the nature of Ebeid's mental illness, since a claimant cannot be considered disabled if drug addiction is a contributing factor material to a determination of disability. 42 U.S.C. §425(d)(2)(C). If I had concluded that Ebeid was disabled, I would have remanded the case for a determination of the role drug abuse played in his disability. However, since I have found that the ALJ's determination of no disability was supported by substantial evidence, no further discussion of this issue is necessary.

B.     The Treating Psychiatrists

Manal Sous, MD, provided Ebeid with psychiatric care on and off beginning in 2005. Record at 407. In the Mental Medical Source Statement dated November 19, 2014, she indicated that Ebeid suffered from a schizoaffective disorder and cannabis abuse. Id. According to Dr. Sous, Ebeid's "active symptoms" were under control at the time she wrote her report, but his cognitive function had declined. Id. She added: "He was never able to maintain a job or relationship or live on his own." Id. Dr. Sous also wrote that Ebeid had episodes of active symptoms when he responded to paranoid hallucinations. Id. She noted that he had been hospitalized more than once. Record at 11.

As discussed above, Dr. Sous indicated that Ebeid was "unable to meet competitive standards" in the ability to maintain attention for two-hour segments. She also found him unable to meet competitive standards in his ability to understand, remember and carry out detailed instructions, maintain regular attendance and punctuality, make simple work-related decisions, and perform at a consistent pace. Record at 409-410. He was seriously limited in his ability to understand, remember or carry out even very short and simple instructions; accept instruction and respond appropriately to criticism from a supervisor, deal with changes in the work setting, set realistic goals and plans, and deal with normal work stress. Id. Nevertheless, Ebeid had a limited but satisfactory ability to interact with coworkers and the general public and maintain socially appropriate behavior. Record at 410.

Dr. Sous explained: "Pt can not sustain focus or stay in one place", and that he could not deal with "multiple tasks or details" or adapt to change. Id. She noted that, when independent, he was non-compliant with medication. Record at 411. She also indicated that substance abuse contributed to Ebeid's limitations, writing: "Sometimes he smokes weed to calm his symptoms

9

but the symptoms [are] beyond the use of weed." Record at 412. She specified, however, that Ebeid's limitations caused by his schizoaffective disorder went "beyond the drug use", and limited his cognitive ability to function. Id.

    The ALJ wrote:

> Dr. Sous's opinion is granted partial weight. She is a treating source with a longitudinal history with the claimant, and the claimant's work history is long with short periods of employment; however, there are multiple references to the claimant being out of the country over the years. Thus, Dr. Sous's statement that the claimant cannot hold a job, and is totally disabled is inconsistent with her own treatment notes. For these reasons, Dr. Sous's opinion is granted partial weight.

Record at 21.

    Clearly, Ebeid is incorrect in arguing that the ALJ failed to "indicate why she credited some of Dr. Sous's opinions and not others." Ebeid's Brief at 23. She did offer an explanation. However, all of Ebeid's travel was to Egypt, his country of origin, and it took place in 2009, before his claimed disabled date. Record at 464, 471. Therefore, the travel is not probative of his mental stability in the relevant time period. Further, the travel was apparently for the purpose of arranging a marriage, as Ebeid testified at the hearing. Record at 64, 471. The marriage soon failed, possibly following an incident of domestic violence. Record at 41. Therefore, this travel is not greatly probative of mental stability even in 2009.

    Ebeid also maintains that the ALJ erred in rejecting the opinion of Paul Cusano, MD, another psychiatrist who treated him at Vantage Health System. Record at 383. In an examination report prepared for the State of New Jersey Division of Family Development, Dr. Cusano indicated that Ebeid was disabled for a year or more because of an anxiety disorder, and a psychosis, not otherwise specified. Record at 362-3.

As with Dr. Sous, the ALJ rejected Dr. Cusano's opinion on the basis of inconsistent treatment notes, but was inaccurate in her discussion of the notes. She wrote: "Notably, on July 5, 2013, Dr. Cusano reported the claimant did not have hallucinations or paranoia, as they appeared to be flashbacks." Record at 20. The note actually reads: "No hall paranoia now Appear to be flashbacks." Record at 377. Clearly, Dr. Cusano was just saying that Ebeid was free of hallucinations and paranoia that week. He was also describing the hallucinations and paranoia as drug flashbacks, which do manifest in this fashion. See Record at 377; Https://www.drugrehab.com/addiction/drugs/hallucinogens/hppd/. This is quite clear from the immediately prior note, which stated: "Fanapt worked no recurrence of visual hallucinations since – may be flash back 2nd [presumably meaning "secondary"] to pot smoke in past." Record at 378.[3]

However, the ALJ was not the only one to misread some of Dr. Cusano's notes. Although the unpunctuated notes are hard to read, Ebeid's interpretations of them border on the fanciful. Ebeid states that the ALJ should have mentioned that he hallucinated voices which were upset with his decision not to commit suicide. Plaintiff's Brief at 21. However, the cited note, written October 17, 2013, states: "Notes OCD type thoughts Den voices upset with turn down not suic." Record at 390. Thus, Ebeid was experiencing obsessive thoughts, but he denied ("Den") hearing voices – he was upset that he was turned down for Social Security (as stated earlier in the note), but he was not suicidal. Ebeid's interpretation of the note is erroneous.

---

[3] Dr. Cusano's initial evaluation of Ebeid on April 8, 2013, contributes to the confusion surrounding the role of drugs in Ebeid's mental illness. Dr. Cusano wrote: "The patient is a chronic marijuana smoker four to five packs [*sic*] a day. According to him, he will become psychotic with auditory visual hallucinations while smoking pot and then later stated that he was having these without pot." Record at 357. He also wrote that Ebeid was smoking marijuana to treat his anxiety, but that: "The patient wants to return to Xanax as it stopped his panic attacks according to him and is afraid he will become psychotic, start hallucinating while smoking marijuana." Id. Also, "Again the patient states that" he sought mental health treatment several times at Bergen "while smoking marijuana heavily, this triggers psychosis." Id.

Ebeid also writes that Dr. Cusano's notes prove that the injury to his left foot was nothing but a hallucination. Plaintiff's Brief at 21. That is not what the cited note says. The note, dated April 22, 2014, reads: "Says injured L foot 2 years ago on forklift Left fracture … Lawyer went to court to reopen case to get surgery also for footdrop Says court approv surg reopened case note ^ 'Halluc'" Record at 395. On the same page, Dr. Cusano wrote: "Says halluc now flash lights circle moving." Id. It is fairly obvious that Dr. Cusano meant that Ebeid successfully sought coverage of some kind for a foot surgery. This would suggest that there was some sort of injury to the foot. The doctor then observed that Ebeid had an increase in hallucinations, which he described to Dr. Cusano as flashing lights.

Thus, the ALJ's treatment of the expert opinions was flawed. However, remand is not necessary to correct this, because the ALJ relied upon other evidence which was adequate to support her conclusion that Ebeid was not completely disabled. For one thing, Ebeid's hallucinations were not nearly as frequent or intrusive as described in his brief. Also, as discussed above, substantial evidence supported the ALJ's conclusion that Ebeid was only moderately limited in concentration. Further, as the ALJ also noted, Ebeid wrote in his function report that he attended church, and went to events with his family. Record at 19, 260. Even Dr. Sous believed that Ebeid was satisfactory in his ability to interact with others. Record at 409, 410.

Other evidence not cited by the ALJ might also be relevant on remand. For example, Dr. Sous described Ebeid as cognitively impaired, and lacking in concentration, yet he was able to complete a medical assistant program between 2010 and 2012, during his claimed period of disability. Record at 36.

It should also be emphasized that the ALJ did, in fact, partially accept the opinions of Drs. Sous and Cusano. She found that Ebeid suffered from the severe impairment of schizophrenia, an anxiety disorder, a mood disorder, and a substance abuse disorder. She limited him to work requiring only simple decisions and occasional changes in work tasks, with no direct customer service, or teamwork or tandem work. Record at 18. Thus, she did not deny or ignore the fact that Ebeid suffered from limitations as a result of his mental illness.

C.  The January, 2013, Mental Health Treatment

Despite Ebeid's claim to the contrary, there was no January, 2013, "psychiatric admission." As discussed above, although the emergency room physicians at Hackensack University Medical Center offered to admit Ebeid to treat his psychosis, he refused treatment. Record at 423.

It is true that the ALJ did not specifically mention this fairly dramatic event. Nor did she mention Ebeid's testimony that, before seeking assistance in the emergency room, he had prepared to remove the "metal" himself, using a pair of scissors, a knife, an alcohol swipe, and a magnet. Record at 75. Emergency room records state, regarding Ebeid's left foot: "small red spot noted, skin intact." Record at 420.

Perhaps the decision would have been more complete if the ALJ had described this extremely delusional behavior. However, the failure to do so did not constitute material error. Ebeid argues that this information "constitutes compelling and substantial evidence of psychotic decompensation." Record at 24. However, the ALJ did not deny that Ebeid suffered from psychotic decompensation – on the contrary, she found that he experienced one or two episodes of extended decompensation. I have suggested that this may be one of the events to which she referred.

Further, the ALJ recognized that Ebeid had schizophrenia, and did not deny that he met the criteria for Listing 12.03, which specifies psychotic behavior including delusions or hallucination. However, she was also accurate in noting that Dr. Cusmano's records indicated that Ebeid's psychotic symptoms improved when he was not smoking marijuana. Record at 21, citing 387-8.

D.   Ebeid's Testimony

Regarding Ebeid's testimony at the hearing, the ALJ wrote:

> The claimant testified that he has a driver's license, lives with his parents and drives their car locally, on a daily basis. He stated that he … cooks, does laundry, vacuums, grocery shops, and spends six hours a day watching television, and he uses a computer once a week for one hour. Additionally, he visits with his aunt weekly, his sister twice a month, and his aunts and uncles go to visit with him. … Concerning his mental impairments, the claimant testified that he feels paranoid when he is around crowds, and hears voices, with the last time six years prior. The claimant stated that he treats with Dr. Sous once or twice a month and six months prior to the hearing, his medication was adjusted.

Record at 19. This is largely accurate. The glaring exception is that Ebeid actually testified that he last hallucinated six *months* before the hearing, and not six years, but Ebeid has not mentioned this error, probably having concluded that it was a typographical error. (I have edited the quote to omit the portion relating to Ebeid's physical condition, which is not the subject of his Request for Review).

Ebeid argues that the ALJ cherry-picked positive observations from his testimony, and wrongly ignored his testimony about his delusions and hallucinations. First, he writes:

> The Plaintiff testified to hearing voices, seeing a shadowy figure telling him to watch his balance. At the hearing, he provided a detailed description of attempting to operate on his own foot to take out a perceived imaginary metal piece that was communicating with him.

Plaintiff's Brief at 25. This, of course, refers to Ebeid's testimony pertaining to his January, 2013, visit to the emergency room.

As discussed above, the ALJ did not mention events of January 18, 2013. It is reasonable to argue that this omission tended to obscure the more extreme manifestations of his mental illness. Nevertheless, as was also discussed above, the ALJ acknowledged that Ebeid suffered from schizophrenia, and that he experienced hallucinations and delusions. In this context, the ALJ's failure to describe this event was not material, particularly since there was no other incident of this gravity in the relevant time period.

Ebeid testified that he heard voices every month or two. Record at 74. However, out of three examples he gave, one related to the January 18, 2013, incident, and another to the day of his forklift accident, which he claims occurred eight years earlier, in 2005. Record at 39, 74.

As to the forklift accident, Ebeid maintains that "there was extensive testimony by Plaintiff which demonstrated that he was under an obvious delusion that he suffered a serious forklift injury which he described during the hearing in psychotic detail." Plaintiff's Brief at 25. He argues that the ALJ erred in failing to address this.

Ebeid testified that he hallucinated a voice speaking to him from a wall immediately before his accident. Record at 49, 74. However, the proposition that the accident itself was a psychotic delusion is grossly inconsistent with the record. First, as the Commissioner has pointed out, Ebeid was able to provide detailed testimony about the duties of his job as a forklift operator in a storage warehouse, such as that "the palette would be ready and full, and I would just have to get the forklift to pick it up and bring it to exactly where he told me to put it." Record at 85-6. He also described the steering mechanism of the forklift. Id.

Also, Ebeid testified that the first surgery on his left foot was a compartment syndrome operation, to "open it up and let the fluids out." Record at 51. This appears to be an accurate description of a procedure also known as a fasciotomy, which is performed following a severe accident such as a crush injury, in order to relieve pressure within muscles. See https//orthoinfo.aaos.org/en/diseases- - conditions/compartment-syndrome/. This would be consistent with the accident Ebeid described. Record at 49-50. It is not probable that a psychotic delusion would be accompanied by such credible medical detail.

Finally, although there are no records from a 2005 compartment syndrome surgery in the record, there are medical observations which suggest that the surgery occurred. When Ebeid was examined at Holy Name Medical Center on December 25, 2012, he was noted to have a 4-centimeter scar on the back of his left foot. Record at 328. Orthopedic notes from 2015 attribute Ebeid's pain in his left foot to "tarsometatarsal arthrodesis due to chronic and painful tarsometatarsal arthritis secondary to trauma." Record at 503. In other words, Ebeid's orthopedist concluded that he developed arthritis in his left foot at the site of a past injury. It is impossible to conclude that the ALJ erred by failing to write that Ebeid's forklift accident was a delusion. Ebeid's counsel did not even mention such a possibility at the hearing.

Ebeid also argues that the ALJ erred in failing to discuss his testimony that he suffered from panic attacks. Record at 70. The ALJ did not ignore this, however, as she specified that Ebeid had a severe anxiety disorder. Record at 15.

E.      Ebeid's Functional Limitations

Ebeid's final argument is that the ALJ did not consider the impact of his mental impairment on his functional abilities. This is obviously untrue. At the third stage of the sequential evaluation, the ALJ rated the severity of Ebeid's mental restrictions. Record at 16-17. She later discussed his representations as to his own functioning, both in his functional report, and in his testimony. Record at 18-19. She also discussed Ebeid's treating mental health practitioners' opinions as to his functional limitations, and assigned them partial weight. Record at 20-21. She crafted RFC limitations which corresponded to the evidence which she credited.

As I have discussed, the ALJ's decision is in some ways imperfect. In particular, some of the reasons she gave for failing to credit the opinions of Drs. Sous and Cusano were not accurate. Nevertheless, she generally provided a thorough discussion of the record, and an explanation as to how her conclusions regarding Ebeid's functional abilities were based on that record. Despite some deficiencies, therefore, the ALJ adequately complied with 20 CFR §404.1520(a) and the former SSR 96-8(p).

V.      Conclusion

In accordance with the above discussion, I conclude that the decision of the ALJ must be affirmed, and judgment entered in favor of the Commissioner.

BY THE COURT:

/s/ Jacob P. Hart

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE